## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

PATRICIA DIANE MEEKS,

        **Plaintiff,**

v.                                  **Case No. 8:09-cv-1050-T-TBM**

MURPHY AUTO GROUP, INC.
d/b/a TOYOTA OF WINTERHAVEN,

        **Defendant.**

_____/

## O R D E R

THIS MATTER is before the court on **Defendant's Motion for Summary Judgment** (Doc. 65)[1] and Plaintiff's response in opposition (Doc. 76).[2] Oral arguments were held on October 7 and December 8, 2010. By the instant motion, Defendant seeks entry of final summary judgment in its favor as to all of the claims raised in Plaintiff's Second Amended Complaint. Because Plaintiff fails to prevail on any of her claims as discussed below, I conclude that Defendant is entitled to final summary judgment in its favor.

_____

[1]In support of its motion, Defendant files redacted exhibits (Doc. 66), corrected exhibits (Doc. 74), and the deposition transcripts of Richard Sanchez, Alan Murphy, Patricia Meeks, Robert Thompson, and numerous exhibits (Docs. 65-1 through 65-15). Additionally, at the court's request, the Defendant re-filed more legible copies of several exhibits. (Doc. 86).

[2]In response, Plaintiff filed Toyota of Winter Haven's Certificate of Permissible Purpose (Doc. 73). On September 24, 2010, she filed the affidavit of Mark Catasus and the expert report of Stan Smith, Ph.D., in support of her opposition memorandum. *See* (Docs. 75, 76). Defendant has filed **Murphy Auto Group's Motion to Strike re: Affidavit of Mark Catasus and Expert Report of Stan Smith**. (Doc. 81).

I.

A.

Plaintiff, Patricia Meeks, sues Defendant, Murphy Auto Group, Inc., for violations under the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA") and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691, et seq., and Regulation B, 12 C.F.R. §§ 202.1, et seq. ("ECOA"). Many of the facts pertinent to the legal issues raised by the motion are undisputed. On or about May 16, 2007, Plaintiff sought to purchase a motor vehicle for her daughter from Defendant. After selecting a new 2007 Toyota Solara vehicle and some negotiations, Plaintiff signed a retail installment sales contract ("RISC") (Doc. 65-1), together with an Offer to Purchase (Doc. 66-1), a Consumer Protection Form (Doc. 65-3), a Bailment Agreement for Vehicle Spot Delivery (Doc. 65-4), an acknowledgment of receipt of Privacy Protection Notice (Doc. 65-5), a Standard Credit Application (Doc 66-2, 86-2), and an Agreement to Furnish Insurance Policy (Doc. 65-7). Under the terms of the RISC, Plaintiff made a down payment of $5,000.00 with the amount financed of $18,708.58 to be paid over 72 months at $413.71 per month. *See* (Doc. 65-1 at 1). Defendant does not finance its vehicle sales and in this case as in all other credit sales, it sought to locate a lender to finance the deal.[3] Plaintiff maintains that after discussions, she was advised by the sales person that she

_____

[3]Notice of this fact is not expressly set forth in the RISC, which identifies Defendant as "Creditor - Seller." The RISC does indicate that "Seller assigns its interest in this contract to Regional." (Doc. 65-1 at 2). The consumer protection form, which Plaintiff initialed and signed, advises that ". . . DELIVERY OF THIS VEHICLE IS CONTINGENT UPON THE DEALER OBTAINING FINANCING. IN THE EVENT FINANCING IS NOT OBTAINED, I MUST SECURE MY OWN FINANCING, OR RETURN THE VEHICLE TO TOYOTA OF WINTER HAVEN WITHIN 24 HOURS." (Doc. 65-3). The bailment agreement indicates that such is attached as part of the sales contract and concerns the vehicle " PENDING CREDIT APPROVAL OF BUYER(S) BY

was approved for financing and when she left the dealership, she believed the car was hers.

The vehicle was delivered that day to Plaintiff's daughter in a so-called "spot delivery."

Defendant describes a "spot delivery" as one where the terms of the transaction have been

agreed upon, but the financing has not been approved.  Under the bailment agreement, the

customer is given the vehicle to use subject to having to return it to the dealer should

financing not be arranged.  As was its practice, Defendant obtained credit information about

the Plaintiff.  Defendant transmitted the deal to Regional Acceptance Corporation (Regional)

which initially approved the loan.  (Doc. 65-9)  On or about June 4, 2007, Regional

purportedly forwarded to Defendant a Contract Return Notice indicating that 2-years tax

returns, proof of residence and 6 more references were necessary.  The notice indicated that

"APPROVAL EXPIRES 6/16/07."  *Id.*  The loan was never closed with Regional, ostensibly for the

failure of Plaintiff to provide adequate documentation.  In June 2007, the vehicle was

involved in an accident sustaining over $4,000.00 in damages.  Insurance proceeds for the

damage were paid to Plaintiff, but were not used to repair the vehicle.  In early July 2007,

Plaintiff's husband, Michael K. Williams, sought to purchase the vehicle by himself or as a

co-signer.  (Doc. 86-3).  Another credit application was completed.  (Doc. 86-4).  No

financing was obtained, and it appears in late July 2007 that the husband advised Defendant

that he would be returning the vehicle.  (Doc. 65-11)  The vehicle was not voluntarily

---

LENDING INSTITUTION AND COMPLETION OF SALES TRANSACTION, . . . .  DELIVERY OF SAID
VEHICLE BY DEALER IS HEREBY MADE TO BUYER(S) AS A CONVENIENCE TO BUYER(S), AND IS
SUBJECT TO ALL TERMS AND CONDITIONS IN SAID SALES AGREEMENT . . . .  SAID VEHICLE
SHALL REMAIN THE PROPERTY OF THE DEALER."  (Doc. 65-4).  Plaintiff also signed an
agreement to furnish insurance (Doc. 65-7) in which "REGIONAL ACCEPTANCE CORP.," is
identified as the loss payee.

3

returned.  Ultimately, in September 2007, Plaintiff was notified by letter that Defendant was rescinding the contract and demanding the return of the vehicle.  (Doc. 65-10).  The vehicle was finally recovered by Defendant pursuant to court order (Doc. 65-15) in November 2007. Plaintiff now sues Defendant for federal statutory violations and a declaration that certain definitional provisions of Florida motor vehicle law are in violation of these statutes and other federal law.

In Count I of her Second Amended Complaint, Plaintiff alleges that in connection with the sale of the vehicle, Defendant accessed and obtained her consumer credit reports on June 29, 2007, and again on August 17, 2007, for an improper purpose.[4]  (Doc. 37, ¶¶ 9, 10). Since Defendant completed the transaction in May 2007, the later credit pulls were not for the purpose of extending credit to the Plaintiff and were in violation of the FCRA.  *Id.,*  ¶¶ 10, 11. Plaintiff alleges alternatively that Defendant acted either willfully or negligently and she seeks either actual damages or statutory damages, punitive damages, injunctive and declaratory relief, fees and costs.  *Id.,* ¶¶ 11-13.

In Count II, Plaintiff alleges that Defendant is a creditor as that term is defined in 15 U.S.C. § 1602, 12 C.F.R. § 226.2, 15 U.S.C. § 1691a(e), and 12 C.F.R. § 202.2(1).  And, that Defendant's rejection of Plaintiff's credit application in May 2007 was an "adverse action" as that term is defined in 12 C.F.R. § 202.2(c).  Thus Defendant was required to issue a written adverse action notice under 15 U.S.C. § 1691(d) and Reg. B at 202.9.  *Id.* at ¶ 17.  Plaintiff

---

[4]Plaintiff also alleges that the Defendant's May 15, 2007, credit pull was not for a permissible purpose either, but she does not include this instance because it is time-barred. (Doc. 37, ¶ 10).

4

seeks actual damages, punitive damages up to $10,000, declaratory and injunctive relief, attorneys fees, and costs.

Count III seeks a declaration that Florida Statutes §§ 319.001(9), Fla. Stat. (2008) and 320.60(10), Fla. Stat. (2006), are unconstitutional as being in violation of the Truth in Lending Act (TILA), the FCRA, the ECOA, and the Supremacy Clause of the United States Constitution.

B.

By its motion for final summary judgment, Defendant first argues that Plaintiff's claim for alleged violation of the FCRA fails because Plaintiff is unable to establish that Defendant accessed her credit without a permissible purpose.  On the contrary, Defendant argues that the undisputed facts establish that Plaintiff signed two credit applications which provided the written authorization necessary to establish the permissible purpose for obtaining her credit report under the FCRA.  Defendant urges further that notwithstanding Plaintiff's written authorizations, the FCRA authorizes a person to obtain a credit report if that person has a legitimate business need for the information in connection with a business transaction and for purposes of review or collection of an account of the consumer.

In support, it cites to the first Standard Credit Application dated May 16, 2007, which provided:

> I/we certify that the information provided on this application is, to the best of my/our knowledge, complete and accurate.  I/we understand that the financial institution(s) will rely on this information to judge my/our credit worthiness, and will retain this application and information about me/us whether or not the application is approved.  Further, I/we authorize an investigation of my/our credit and employment history, I/we authorize the lender to release information about its experience with me/us.  I/we

understand that false statements may subject me/us to criminal penalties.
(Doc. 86-2).

It cites also to additional language in the second Standard Credit Application which

provided:

> You agree that we may obtain a consumer credit report periodically from
> one or more consumer reporting agencies (credit bureaus) in connection
> with the proposed transaction and any update, renewal, refinancing, modifi-
> cation or extension of that transaction.  You also agree that we or any affiliate
> of ours may obtain one or more consumer credit reports on you at any time
> whatsoever.  If you ask, you will be told whether a credit report was requested,
> and if so, the name and address of any credit bureau from which we or our affiliate
> obtained your credit report.  (Doc. 86-4).

By Defendant's account of the credit pulls, the first credit pull in May 2007 was

made in connection with the initial attempt to get Plaintiff financing.  The second credit pull,

on or about June 29, 2007, occurred during the time Plaintiff's husband was attempting to

negotiate financing for the vehicle either individually or as a co-signor.  The third credit pull,

on August 17, 2007, occurred after Defendant was unable to obtain financing with a third

party lender and Plaintiff failed to return the vehicle.  By its account, Defendant was forced to

take steps to enforce its rights to recover the vehicle.  Plaintiff offers no contrary testimony

regarding the purposes of these credit pulls and Defendant maintains that each credit pull was

made for one or more permissible purposes under the FCRA.  More particularly, it notes that

Plaintiff signed two credit applications which included authorizations permitting inquiry into

her credit history.  Such written authorization provided Defendant with the necessary

permissible purpose under the statute.  *See* 15 U.S.C. § 1681b(a)(2).  Apart from the written

authorizations, it asserts that it had a legitimate business need for the credit information in

connection with this business transaction initiated by the Plaintiff.  That too provides for a

6

permissible purpose.  *See* 15 U.S.C. § 1681b(a)(3)(F).  As for the third credit pull, Defendant

argues that such was also for a permissible purpose because the FCRA authorizes a business

to access a credit report upon a reasonable belief such is necessary for the "review or

collection of an account of the consumer."  *See* 15 U.S.C. § 1681b(a)(3)(A).  In sum, because

each of Defendant's inquiries into Plaintiff's credit was for a permissible purpose, Plaintiff's

claims under the FCRA fail as a matter of law.  (Doc. 65 at 9-13).

As additional grounds for summary judgment, Defendant also urges that Plaintiff's

failure to prove actual damages causally connected to the credit pulls bars her from bringing a

negligence claim under the FCRA.  Further, Defendant argues that Plaintiff fails to prove her

claim that the violation of the FCRA was "willful," that is, in conscious disregard of her

rights.  Accordingly, she may not claim statutory or punitive damages either.  Finally, to the

extent Plaintiff seeks injunctive or declaratory relief, Defendant urges that such is not

available to an individual.  (Doc. 65 at 9-18).

As to Plaintiff's ECOA claim, Defendant urges summary judgment is appropriate

because Defendant was not obligated to provide an adverse action notice under 15 U.S.C.

§ 1691(d), where, as here, it did not participate in setting the terms or making the decision to

extend credit.  Citing regulations and commentary from the Federal Reserve Bank, it argues

that as a "referring creditor" under this Act, that is, one who merely refers applications to

others actively involved in setting credit terms and making decisions regarding extending

credit, it was obliged to comply with the Act solely for the purposes of its anti-discrimination

and anti-discouragement provisions.  Here, neither discrimination nor discouragement is

alleged, and it had no duty under the ECOA to issue an adverse action notice.  (Doc. 65 at 18-21).

As to Plaintiff's final claim that Florida Statute §§ 310.001(9) and 320.60(10) are unconstitutional as being in conflict with the Truth in Lending Act (TILA), 15 U.S.C. § 1601, et seq., the ECOA, or the FCRA, such matters are addressed separately below.

As for Defendant's argument under the FCRA, Plaintiff responds that while Defendant asserts it had a permissible purpose for pulling Plaintiff's credit report and that Plaintiff signed an authorization to that effect, the credit application used by Defendant is illegal because it purports to authorize pulling of credit reports at any time for any purpose.[5] In support, she cites Appendix B to Regulation B, 12 C.F.R. § 202.1, et seq., which provides a sample credit application for closed-end, secured credit relevant to a motor vehicle credit transaction.  Such form does not allow for anyone other than the creditor to access the

---

[5]Although Plaintiff's complaint does not raise a separate TILA claim, her legal argument begins with the contention that these type spot deliveries violate TILA.  Thus, here, the Defendant is a "creditor" for purposes of the TILA and it violates the same by falsely maintaining that it is not.  By her account, the RISC, which identifies Defendant as the creditor, is a fully-integrated extension of credit by Defendant to Plaintiff and contains an unequivocal representation to the Plaintiff that the dealership is extending her credit.  And, because Defendant extended Plaintiff credit by virtue of the RISC, there can be no other creditor, regardless of any bailment agreement.  As a consequence, Plaintiff became the owner of the Toyota Solara as of May 15, 2007, when she executed the RISC.

To the extent that counsel broadly condemns these motor vehicle conditional sales contracts as violative of TILA, I disagree and note that the argument has been previously tested and rejected. *See Chastain v. N.S.S. Acquisition Corp. d/b/a Bev Smith Toyota*, No. 08-81260-CIV, 2009 WL 1971621, at *3-4 (S.D. Fla. July 8, 2009), *aff'd* No. 09-14157, 2010 WL 1881068 (11th Cir. 2010) ("Florida law permits parties to condition formation of a contract on the occurrence of an event such as third party financing.").  While TILA violations surely can arise in such transactions, in my view, under Florida law when all conditions are fairly revealed in the sales documents and agreed to by the parties, there is no TILA violation per se. *See Bragg v. Bill Heard Chevrolet, Inc. - Plant City,* 374 F.3d 1060, 1067-68 (11th Cir. 2004).

8

applicant's credit report.  She further maintains that section 1681e(a) requires that an entity

such as Defendant first certify its permissible purpose before accessing consumer credit

reports.  Here, Defendant has certified only one permissible purpose, namely as a creditor for

the purpose of extending credit to an applicant, yet, Defendant, because of the bailment

agreement, denies that it is a creditor.  In the circumstances, Defendant can have no

permissible purpose for these credit pulls.

Regarding damages, Plaintiff proffers the expert opinions of Stan Smith, Ph.D., who

opines that Plaintiff has sustained $1,772.00 in loss of time spent and $1,000.00 in loss credit

expectancy.  Additionally, she notes the availability of statutory damages, attorney's fees, and

costs.

While there is no express response regarding the ECOA claim, Plaintiff argues that

the undisputed facts establish that, as the creditor, Defendant was obliged under the Act to

provide her an adverse action notice that it was revoking the RISC by way of the bailment

agreement conditioning the sale on a third-party lender agreeing to finance the deal.

## II.

The court shall grant summary judgment for the moving party only when "the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is

no genuine issue as to any material fact and that the movant is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  The movant bears the exacting burden of

demonstrating that there is no dispute as to any material fact in the case.  *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323 (1986); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918

(11th Cir. 1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324; *Howard v. BP Oil Co.,* 32 F.3d 520, 524 (11th Cir. 1994). The non-movant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception. *Perkins v. Sch. Bd. of Pinellas County*, 902 F. Supp. 1503, 1505 (M.D. Fla. 1995). It must set forth, by affidavit or other appropriate means, specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2).

When deciding a motion for summary judgment, "[i]t is not part of the court's function . . . to decide issues of material fact, but rather determine whether such issues exist to be tried . . ." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations." *Hairston*, 9 F.3d at 919 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)). The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. *Hairston*, 9 F.3d at 921; *see also Little v. United Techs.,Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997). All the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).

III.

A.

Before addressing the substance of the motion, it is necessary to address Defendant's motion to strike (Doc. 81). By its motion, Defendant seeks an order striking the affidavit of Mark Catasus and the expert report of Stan Smith filed by Plaintiff in connection with her

10

response to the motion for summary judgment.  Defendant argues both are untimely under the court's scheduling order and in violation of the civil rules.  It claims that the first time it was provided the report of Stan Smith was September 24, 2010, when Plaintiff filed her response.  Indeed, the report was dated September 22, 2010, nearly a month after Defendant filed its motion.  In each case, it urges that the opinions are inadmissible under Fed. R. Evid. 702.

The provisions of Rule 26 provide for the disclosure of the identity of any witness it "may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Fed. R. Civ. P. 26(a)(2).  If the witness is one retained or specially employed to provide expert testimony in the case or whose duties as the party's employee regularly involve giving expert testimony, the rule additionally requires a written report containing a "complete statement of all opinions the witness will express and the basis and reasons for them," along with other information.  *Id*.  These disclosures must be made "at the times and in the sequence that the court orders."  *Id.*

Here, the court's scheduling order directed that expert witness disclosures pursuant to Fed. R. Civ. P. 26(a)(2) be made by December 18, 2009.  (Doc. 12).  Rebuttal experts were to be disclosed within twenty (20) days following the initial disclosures.  *Id.*  On December 16, 2009, Plaintiff filed her trial witness disclosure and expert witness disclosure, both of which included the names of experts, Edward Ford, Jr. and Stan V. Smith, Ph.D.  (Docs. 26, 27).  Although Dr. Smith's identity was timely disclosed in December 2009, no report was ever provided until Plaintiff filed her response to Defendant's Motion for Summary Judgment.  Mark Catasus was not disclosed as an expert by the December 18th deadline, nor within the twenty days thereafter.  Rather, Plaintiff, without seeking leave to amend or requesting an

extension of the disclosure deadline, served on Defendant an "amended" expert witness disclosure on or about March 5, 2010, and "change of expert" replacing Edward Ford with Mark Catasus as an expert witness for Plaintiff.  The curriculum vitae and affidavit of Mark Catasus dated March 3, 2010, was apparently attached to the Amended Expert Witness Disclosure.  While Stan Smith was again identified in this amended disclosure, Plaintiff still did not provide an expert report for Smith nor any information regarding the opinions he intended to offer.

As for the report of Dr. Smith, I conclude it was clearly untimely and should be **stricken**.  The federal rules give discretion to district courts to exclude untimely submissions.  Specifically Rule 37(c) states, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, *unless the failure was substantially justified or is harmless*."  Fed. R. Civ. P. 37(c)(1) (emphasis added).  The burden is on Plaintiff to establish that the failure to disclose was substantially justified or harmless.  *Mitchell v. Ford Motor Co.*, No. 08-10302, 2009 WL 593897, at *3 (11th Cir. Mar. 9, 2009) (citing *Leathers v. Pfizer,* 233 F.R.D. 687, 697 (N.D. Ga. 2006).  There is no evidence before the court that Plaintiff's failure to timely disclose the expert opinions of Dr. Smith was substantially justified or harmless.  Plaintiff has failed to file a response to Defendant's motion to strike.  Further, there is nothing in her response to Defendant's summary judgment motion to justify the late disclosure, nor demonstrate that such untimely disclosure is harmless.  To the contrary, as Smith's opinions were not revealed until after Defendant filed its motion for summary judgment, Defendant is clearly prejudiced by the late disclosure.  As

12

urged in Defendant's motion, Smith's report is particularly prejudicial in light of the fact that this was the first time Plaintiff's claim for damages had been elaborated on with any detail.[6] *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 (11th Cir. 2007) (no abuse of discretion in striking untimely affidavits and reports of experts which were filed in response to motion for summary judgment and information had not been earlier disclosed).

As for the affidavit of Mark Catasus, Defendant's complaint of late disclosure and prejudice caused thereby is somewhat less compelling. While it is true that Mark Catasus was not timely identified as an expert in December 2009, nor was any expert report provided by him at that time, Defendant cannot claim total surprise as to the opinions of this witness. In that regard, in April 2010, Defendant filed a motion to strike the affidavit of Catasus which was filed by Plaintiff in opposition to Defendant's motion to dismiss Count II of Plaintiff's Second Amended Complaint. One of the reasons argued for striking the Catasus affidavit was that it contained essentially the same opinions given in the previously provided affidavit of Edward Ford. *See* (Doc. 49). Thus, Defendant was aware of this witness's opinions at that time and therefore cannot claim complete surprise in the expert opinions now proffered by the witness.[7] Having said that, Defendant's arguments challenging Mr. Catasus' qualifications and the substance of his opinions appear to have some merit. Defendant urges that Mr.

---

[6]Because I conclude that disclosure of Smith's report nine months after the deadline was untimely, and should be stricken on that basis alone, the court need not reach the issue of the qualifications of this expert, his methodology, and whether his opinions would assist the trier of fact.

[7]The Ford affidavit was attached to Plaintiff's Amended Complaint filed in September 2009. (Doc. 15). Although subsequently stricken by the court as inappropriate at that time, Defendant nevertheless was aware of the opinions being advanced by Ford, and in any event, the Ford Affidavit was provided with Plaintiff's timely expert disclosures in December 2009.

Catasus offers vague conclusory opinions contradictory to the facts in this case.  By way of example, Catasus states that Defendant accessed Plaintiff's credit history without authorization or for no apparent purpose.  Such self-serving, conclusory statement completely ignores the two express written authorizations provided by Plaintiff.  Indeed, Mr. Catasus does not even list these authorizations among the documents he reviewed in forming his opinions. Defendant also challenges the qualifications of this expert urging that one month training at the JMA School of Finance and under three years of experience as a finance manager for an automobile dealership is insufficient to establish that Mr. Catasus is qualified to provide opinions as to Defendant's compliance with the Truth in Lending Act and the Fair Credit Reporting Act.

While the evidence of surprise is thus less compelling, the disclosure of this witness was untimely and incomplete in contemplation of Rule 26.  Issues related to his expertise and the reliability of his opinions should have been resolved prior to the court entertaining the motion for summary judgment and would have been had counsel complied with the court's scheduling order.  As noted above, Plaintiff offers no explanation or excuse for failing to comply with the scheduling order and the civil rules, and I can find none.  Accordingly, on the basis of the lack of compliance with the rules and the court's scheduling order, Defendant's motion (Doc. 81) is **granted**, and the Catasus affidavit is **stricken** as well.

B.

The Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, et seq., governs the use and dissemination of consumer credit information.  In pertinent part, the FCRA provides that a consumer reporting agency may furnish a consumer report under specified permissible

14

purposes.  *See* 15 U.S.C. § 1681b.  Included in those permissible purposes are reports provided

"[i]n accordance with the written instructions of the consumer to whom it relates" and reports

provided to a person who "otherwise has a legitimate business need for the information in

connection with a business transaction that is initiated by the consumer."  *Id.* at § 1681b(a)(2)

and § 1681b(a)(3)(F)(i).  The FCRA prohibits a person (including a corporation) from

obtaining or using a consumer report for any purpose unless the report is obtained for a

permissible purpose and  ". . . the purpose is certified in accordance with section 1681e . . . by

a prospective user of the report through a general or specific certification."  *Id.* at §

1681b(f)(2).[8]

       I conclude as a matter of law that Defendant acted with a permissible purpose in each

of the credit pulls at issue in this suit.  First, it is indisputable that Defendant acted in

accordance with the written authorizations of Plaintiff, granted in the credit applications,

which permitted Defendant to investigate her credit history and pull her credit report and

scores.  In addition to the authorizations provided under the credit applications, Plaintiff was

advised by Defendant's privacy notice that Defendant would collect and disclose nonpublic

information about her from her credit application(s) and from credit reporting agencies related

to her creditworthiness, credit score, and credit usage.  *See* (Doc. 65-5).  Plaintiff does not

---

[8]The FCRA requires that a consumer reporting agency maintain reasonable procedures so as to avoid inappropriate disclosures of information under § 1681c and to limit the furnishing of consumer reports for those permissible purposes identified in § 1681b.  It dictates that the procedures require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose.  *See* 15 U.S.C. § 1681e(a).

deny that she gave permission to Defendant to investigate her credit report in furtherance of her desire to purchase the vehicle.  She now argues that since the Defendant did not extend credit, its credit pulls were impermissible, but such reading of the FCRA is too narrow.  First, the credit pulls were entirely consistent with the authorizations she granted Defendant to accomplish this.  Defendant need not demonstrate more to establish a "permissible purpose" under § 1681b(a)(2).[9]  Here, because there is no showing that any of the credit pulls were made in the absence of such written authorization, as a matter of law, such credit pulls were made for a permissible purpose under § 1681b(a)(2).

Similarly, Plaintiff fails to demonstrate any question of material fact on Defendant's claim that it also acted out of a reasonable belief that it had a legitimate business need for the information in connection with this transaction and later, that such was appropriate in connection with recovering the vehicle when Plaintiff declined to return it.  Plaintiff unquestionably initiated this transaction and sought credit to purchase the vehicle.  Regardless of the fact that it did not extend credit, the proffered testimony from Defendant's employees, undisputed by the Plaintiff, establishes the legitimate business purpose.  Thus, former general manager, Alan Murphy, testified that credit reports were not pulled until there was an offer to purchase a vehicle and a credit application was signed by the customer.  At that point, the sales

---

[9]In pertinent part, 15 U.S.C. § 1681b(a)(2) provides that a request for a consumer credit report is permissible if it is, "in accordance with the written instructions of the consumer to whom it relates." *See Clemons v. Cutler Ridge Auto., LLC*, No. 06-21648-CIV, 2008 WL 879324, at *3 (S.D. Fla. Mar. 31, 2008) (plaintiff's written authorization provided authority for defendant automobile dealer to lawfully obtain her credit report); *see also* 16 C.F.R. pt. 600, App. (Commentary on the FCRA) ("no other permissible purpose needed" if the consumer furnishes written authorization for a report, that "creates a permissible purpose for furnishing the report").

16

person turned the deal over to the finance department which used the credit information to shop the deal with the finance sources.  (Doc. 68-1 at 4).  According to the corporate representative and finance manager, Robert Thompson, credit pulls were done at the sales desk for several reasons: to determine the credit score, to see if there are any fraud alerts, to check for customer statements, to see if there was current legal mitigation pending on the credit bureau, and to get an idea what the lender that Defendant was going to submit the deal to would see.  (Doc. 70-1 at 12).  The finance department also used the information to make an educated guess as to which lender would approve the deal for financing and to gather information which might be necessary for the lender.  According to Thompson, "[a]nd so being the intermediary between the customer and the bank, we try to gather the information to provide the information to the lender."  *Id.*  Current general manager, Richard Sanchez, acknowledged that Defendant made three credit pulls on Plaintiff's credit.  The first, in May 2007, was done in connection with the purchase to see if Plaintiff qualified for an auto loan and to see who might extend her credit.  (Doc. 67-1 at 15, 28).  The second credit pull in June 2007 was made because they were still trying to get the deal done with Mr. Williams,[10] and as for the credit pull in August 2007, it was made because Plaintiff was not returning the vehicle. *Id.* at 12-13.

---

[10]Here, I note that it is unclear from the proffered evidence whether Mr. Williams had contacted the Defendant by the date of the June 2007 pull.  Documentary evidence reflecting his involvement is dated shortly after that credit pull.  However, it is undisputed that Plaintiff still had not obtained financing at that time, and she makes no showing that such pull was not made for purposes of finding a lender and concluding the deal.

In contrast, Plaintiff proffers only that Defendant could not have had a permissible purpose because it either had already extended credit under the RISC or because it did not finance the vehicles it sold.  However, these arguments read the provisions of § 1681b(a)(3) too narrowly also.  As for her argument that questions of reasonableness are for the jury to decide, while such is often the case, here she proffers no evidence in contradiction of the proof that such credit pulls were made for the legitimate purpose of putting Plaintiff into the vehicle she wished to purchase regardless of whether Defendant was financing the deal or not.  *See Jones v. TT of Longwood,* No. 6:06-cv-651-Orl-19DAB, 2007 WL 2298020, at *5 (M.D. Fla. Aug. 7, 2007) (citing *Stergiopoulos & Castro v. First Midwest Bancorp, Inc.,* 427 F.3d 1043, 1045-47 (7th Cir. 2005); *Smith v. Bob Smith Chevrolet,* 275 F. Supp. 2d 808, 816-17 (W.D. Ky. 2003)).  Absent any demonstration whatsoever that Defendant acted for any other purpose than to help her obtain financing or to protect its interest in the vehicle when the vehicle was not returned, I conclude as a matter of law that the credit reports were obtained and used for permissible purposes under § 1681b(a)(3) as well.

As for the matter of the Defendant's certification of permissible purpose, such was made here pursuant to its subscriber agreement with the consumer reporting agency, First Advantage Credco (Credco).  By that subscriber agreement, Defendant certified that it would seek access to consumer reports ". . . only while operating as a motor vehicle dealership and only on written authorization from [its] customer in connection with [its] proposed extension of credit to that customer." (Doc. 73-1 at 3).  Plaintiff argues that Defendant acted contrary to the certification because the credit pulls were not for purposes of extending credit, but rather for purposes of finding a lender for the deal.  I find this argument without merit as well.

Initially, it is not clear whether there exists a separate cause of action under the certification provision where a permissible purpose exists. *See Breese v. TRIADvantage Credit Servs., Inc.*, 393 F. Supp. 2d 819, 822 (D. Minn. 2005). However, even assuming that Plaintiff may maintain a separate action based on the certification, I find no violation of either sections 1681b(f)(2) or 1681e(a) in the circumstances of this case.

Here, all the credit pulls by Defendant were made under the general certification by which Defendant agreed that it would seek only basic consumer reports and credit risk scores while operating as a motor vehicle dealership on written authorization of its customer and in connection with its "proposed extension of credit to that customer." *See* (Doc. 73-1 at 3). Only the latter condition is at issue and when the whole of the parties' agreement is considered, the credit extension here proposed was for credit by a third party lender. In pursuit of such lender, Defendant pulled its customer's credit report to obtain information which would allow it to determine Plaintiff's credit worthiness and to help identify potential lenders for her deal. The credit pulls in May and June 2007 were entirely consistent with the express wording of Defendant's general certification.

The credit pull in August 2007 was for the different purpose of recovering the vehicle. Plaintiff would urge the violation of the FCRA because the purpose differed from that set forth in the certification. I disagree. Defendant's proposed extension of credit involved third-party financing. Such financing was not obtained. Pursuant to the bailment agreement which, by its terms, was made a part of the sales agreement, Plaintiff was therefore obliged to return the vehicle. In late July 2007, Plaintiff's husband notified Defendant that the vehicle had been wrecked and was being returned. It was not returned, and Defendant again

19

checked Plaintiff's credit history to assist in its collection and recovery of the vehicle.  As

noted above, the requirements on credit reporting agencies under § 1681e(a) are imposed to

assure against improper disclosure of consumer information and to assure that such

information is obtained and used for a statutorily permissible purpose.  In this instance, there is

no allegation of an improper disclosure under § 1681c nor proof that the credit information

was obtained for an impermissible purpose.  As the court in *Breese* noted, the provisions of

§ 1681b(f) permit the user to generally or specifically certify its purpose.  Here, Defendant

acted under a general certification which in my view was adequate in light of the permissible

purpose of the third credit pull to satisfy the FCRA.  As a matter of law, Plaintiff has no claim

for the violation of either § 1681b(f) or § 1681e(a).  *See Breese*, 393 F. Supp. 2d at 823.[11]

    In sum, the undisputed evidence establishes one or more permissible purposes for

each of the credit pulls and a certification made consistent with both § 1681e(a) and §1681b(f)

of the Act.  Accordingly, Defendant is entitled to summary judgment on this count.[12]

C.

    In Count II of the Second Amended Complaint, Plaintiff asserts that Defendant, as a

creditor, violated the notification provisions of the ECOA and regulations thereunder, by

─────────────────────

[11]The *Breese* court cited to the rationale employed by the Fifth Circuit in *Washington v. CSC Credit Services, Inc*., 199 F.3d 263, 267 (5th Cir. 2000).  Although addressing different circumstances than are here present, that court noted that in light of its purposes, "the actionable harm the FCRA envisions is improper disclosure, not the mere *risk* of the improper disclosure that arises when 'reasonable procedures' are not followed and disclosures are made."  *Id.*  In the absence of such improper disclosure, a violation of the reasonable procedures required under § 1681e(a) is not actionable.

[12]On this conclusion, I find it unnecessary to address the matter of Plaintiff's damages apart from noting that she offers no admissible proof of actual damages in connection with these credit pulls nor any entitlement to statutory damages.

failing to issue an adverse action notice when it denied Plaintiff's May 2007 credit application. The claim is premised on the contention that the Defendant, in effect, rescinded its unequivocal grant of credit to Plaintiff under the RISC by conditioning the contract on third-party financing. By Plaintiff's argument, since Defendant gave no notice of adverse action in connection therewith, the ECOA was violated.

Defendant urges summary judgment is appropriate because it was not obligated to provide an adverse action notice under 15 U.S.C. § 1691(d), where, as here, it did not participate in setting the terms or making the decision to extend credit. By its account, it merely a "referring creditor"under this Act, and as such, it was obligated to comply with the Act and regulations solely for the purposes of its anti-discrimination and anti-discouragement provisions. Thus, it had no duty under the ECOA to issue an adverse action notice. In any event, it urges that the facts establish that Plaintiff was not denied credit but instead was approved for a loan by Regional Acceptance, the lender to whom it sent Plaintiff's credit application. The approval expired when Plaintiff failed to provide Regional Acceptance with additional documentation it requested. (Doc. 65 at 18-21).

The ECOA, 15 U.S.C. § 1691, et seq., was enacted to prohibit discrimination in credit transactions. *Treadway v. Gateway Chevrolet Oldsmobile Inc.,* 362 F.3d 971, 975 (7th Cir. 2004). It was later amended to require creditors to furnish written notice of the reasons why an adverse action was taken against a consumer. *Id.;* 15 U.S.C. 1691(d)(2) and (3). By the amendment, Congress intended to provide some transparency to the process and to protect consumers from credit denials for discriminatory reasons. *Id.* at 977; *Hunter v. Bev Smith Ford, LLC*, No. 07-80665-CIV, 2008 WL 1925265 (S.D. Fla. Apr. 29, 2008), *aff'd* No. 08-

13324, 2009 WL 3818749 (11th Cir. Nov. 17, 2009).  The Act permits an applicant to bring a civil action against "[a]ny creditor who fails to comply with any requirement imposed under this subchapter" for any actual damages sustained.  15 U.S.C. § 1691e.

Congress delegated to the Board of Governors of the Federal Reserve System the authority to promulgate regulations to carry out the purposes of the Act.  *See* 15 U.S.C. § 1691b; 12 C.F.R. § 202.1.  Under the Act and regulations, a creditor must provide the consumer with notice of the action taken on a credit application including a written statement of the reasons for any denial.  More particularly, the creditor has thirty days from receipt of a completed credit application to notify the applicant of the action taken.  If the application is denied, the creditor must also provide a statement of the specific reasons why credit was denied or a notice of the right to such statement.  12 C.F.R. § 202.9; *see also* 15 U.S.C. § 1691(d).

To establish her claim, Plaintiff must prove that Defendant (1) was a creditor, (2) who took adverse action against her, and (3) failed to provide her with an adverse action notice.  *Hunter,* 2008 WL 1925265, at *6 (citing *Madrigal v. Kline Oldsmobile, Inc.,* 423 F.3d 819, 822 (8th Cir. 2005)).  Here, it is undisputed that Defendant, at no time, gave Plaintiff a notice of an adverse action.  Thus, Plaintiff must prove that Defendant was a "creditor" and that it took an "adverse action" as such is defined by the ECOA.  As noted, Defendant disputes both elements urging as a matter of law that it is not a "creditor" under the ECOA such that it was obliged to issue a notice of adverse action, and it denies that there was in fact an adverse action in the circumstances of this case.

22

The ECOA defines "adverse action" to mean "a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested. . . ." 15 U.S.C. § 1691(d)(6). The regulation provides similarly that an "adverse action" means "[a] refusal to grant credit in substantially the amount or on substantially the terms requested in an application . . . ." 12 C.F.R. § 202.2(c).

The ECOA defines "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." 15 U.S.C. § 1691a(e). The concomitant regulation defines "creditor" as "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, . . . who so participates. For purposes of § 202.4(a) and (b), the term creditor also includes a person who, in the ordinary course of business, regularly refers applicants or prospective applicants to creditors, or selects or offers to select creditors to whom requests for credit may be made. . . ." 12 C.F.R. § 202.2(*l*). Sections 202.4(a) and (b) prohibit the creditor from discriminating against a consumer in the credit decision and from discouraging the consumer from seeking to apply for credit. The Seventh Circuit has concluded under this regulatory definition, that one who regularly refers applicants to lenders

is a "creditor" under the Act only for purposes of the anti-discrimination and anti-discouragement provisions of §§ 202.4(a) and (b).  *See Treadway,* 362 F.3d at 979.[13]

By my consideration, it is unnecessary (if not inappropriate) to decide on this motion whether Defendant was a "creditor" or merely a "referring creditor" under the ECOA because Plaintiff offers no proof that Defendant took any adverse action against her as alleged in the complaint.[14]  Stated simply, Defendant did not deny Plaintiff credit as she contends.  Indeed, even by her own account, Plaintiff was approved for financing when she left the dealership that day, a fact not denied by Defendant.  Nor do the facts support that Defendant rescinded the RISC by use of the bailment agreement and conditioning the sale on third-party financing.

---

[13]In so concluding, the court cited to the commentary on this provision by the Federal Reserve Board wherein it recognized "that in the credit application process persons may play a variety of roles, from accepting applications through extending and denying credit. . . . For example, an automobile dealer may merely accept and refer applications, perform underwriting, and make a decision whether to extend credit.  Where the automobile dealer only accepts applications for credit and refers those applications to *another* creditor who makes the credit decision– for example, where the dealer does not participate in setting the terms of the credit or making the credit decision– the dealer is subject only to §§ 202.4(a) and (b) for purposes of compliance with Regulation B."  *Treadway,* 362 F.3d at 979-80 (citing 68 Fed. Reg. at 13155 (Mar. 18, 2003)).

[14]On the issue of whether Defendant was a creditor in this instance, I find the proffered evidence unclear on the matter.  Defendant's proffered testimony is that it neither provides financing nor sets the terms of the credit.  In Plaintiff's favor, beyond the fact that Defendant identifies itself as the "creditor" in the RISC, it appears that the terms of financing set forth in the RISC and for which Plaintiff was approved were set by Defendant on May 16, 2007.  The deal was then floated to Regional Acceptance which indicated on the following day that it approved the deal on the same terms.  Thus while the decision to extend credit was left to be made by the third-party lender, the terms of the credit which Plaintiff agreed to were those apparently set by Defendant.  The setting of the terms of credit is a significant factor in the calculus for determining whether Defendant is the creditor under the ECOA.  12 C.F.R. § 202.2(*l*) ("Creditor means a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor also includes a creditor's assignee, . . ."); *see Treadway,* 362 F.3d at 978-80.  In any event, I am unable to reach a conclusion on this issue on this motion.

Vehicle sales conditioned on third-party financing of this sort are lawful in Florida if properly contracted for. *Dodge City, Inc.,* 693 So. 2d at 1033, 1035 (Fla. Dist. Ct. App. 1997); *King v. King Motor Co. of Ft. Lauderdale,* 900 So. 2d 619 (Fla. Dist. Ct. App. 2005); *Huskamp Motor Co. v. Hebden,* 104 So. 2d 96 ( Fla. Dist. Ct. App. 1958).  Under Florida law, "[d]ocuments executed by the same parties, on or near the same time, and concerning the same transaction or subject matter are generally construed together as a single contract.  Where a writing expressly refers to and sufficiently describes another document, the other document, or so much of it as is referred to, is to be interpreted as part of the writing." *Quix Snaxx, Inc. v. Sorenson*, 710 So. 2d 152, 153 (Fla. Dist. Ct. App. 1998).  Thus, as in the *Dodge City* case, when the contract documents agreed to by the customer make clear that she agrees to return the vehicle to the dealership if the dealership does not find financing, such agreement is fully enforceable under Florida law.  Under Florida contract law, the conditioning of the RISC in such fashion does not work a rescission of the RISC.  Pertinent to the actual ECOA claim made by Plaintiff, I conclude that the conditioning of her sales agreements in this matter upon the finding of a third-party lender is not an adverse action under the ECOA such that Defendant was obliged to provide Plaintiff with a notice of adverse action.[15]  Defendant is entitled to summary judgment on this claim as well.

---

[15]Plaintiff brings no contract claim in this suit, and thus I find it unnecessary to address the efficacy of the bailment agreement and other documents signed by Plaintiff to condition the RISC under the so-called *Quix Snaxx* rule.  *See Bragg,* 374 F.3d at 1067-68.

D.

In Count III, Plaintiff seeks declaratory relief in the form of an order from the court declaring unconstitutional Florida Statute §§ 319.001(9) and 320.60(10) as being in conflict with the TILA, 15 U.S.C. § 1601, et seq., the ECOA, the FCRA, and the Supremacy Clause of the United States Constitution.[16]  These provisions, by which "new motor vehicle" and "motor vehicle" are defined by the Florida legislature state in pertinent part that: "when legal title is not transferred but possession of a motor vehicle is transferred pursuant to a conditional sales contract . . . and the conditions are not satisfied and the vehicle is returned to the motor vehicle dealer, the motor vehicle may be resold by the motor vehicle dealer as a new motor vehicle, provided . . . ." Fla. Stat. §§ 310.001(9) and 320.60(10).[17]  Plaintiff argues that these two statutory provisions authorize motor vehicle dealers "to falsely claim they are not creditors, and to unilaterally revoke otherwise completed financing contracts, and to reacquire motor vehicles delivered pursuant to the RISC . . ." in violation of Florida law and the federal statutes.  She urges that the use of bailment agreements, as employed in her case to condition an otherwise unconditional RISC, is violative of the TILA, particularly, at §§ 1601(a) and 1638, and the regulations thereunder at 12 C.F.R. §§ 226.17(a) and 226.18.  As for the FCRA and the ECOA, she urges that the definitions violate each because they permit the dealer to

---

[16]Plaintiff purports to bring this claim pursuant to Fed. R. Civ. P. 5.1.  The remedy, if one is available, is pursuant to the provisions of 28 U.S.C. § 2201.  In pertinent part, § 2201 provides: "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201(a).

[17]Chapter 319 addresses title certificates.  Chapter 320 addresses motor vehicle licenses.

claim it is not a creditor when in fact it is.  (Doc. 37 at 9-10).  Here, I respectfully decline to

entertain the claim beyond the discussion set forth above.

Initially, I question whether there is a case or controversy existing between these

parties concerning these two provisions of Florida law.  As explained by the Supreme Court,

> The difference between an abstract question and a 'controversy' contemplated
> by the Declaratory Judgment Act is necessarily one of degree, and it would be
> difficult, if it would be possible, to fashion a precise test for determining in every
> case whether there is such a controversy.  Basically, the question in each case is
> whether the facts alleged, under all circumstances, show that there is a substantial
> controversy, between parties having adverse legal interests, of sufficient immediacy
> and reality to warrant the issuance of a declaratory judgment.

*Md. Cas. Co. v. Pac. Oil Co.*, 312 U.S. 270, 273 (1941).  Here, the purported controversy

under these statutory provisions is more academic than real and lacks the immediacy requisite

for an actual case or controversy.  Further, the declaratory judgment act does not give rise to

an independent basis to confer federal jurisdiction.  *See Wendy's Intern., Inc. v. City of*

*Birmingham*, 868 F.2d 433, 435 (11th Cir.1989); *Jones v. Alexander*, 609 F.2d 778, 781 (5th

Cir. 1980).  Thus, because I find Defendant is entitled to final summary judgment on the

claims brought pursuant to the FCRA and the ECOA, there no longer exists a case or

controversy between these parties such that the court should entertain this count.

Beyond that consideration, whether to grant declaratory relief "is a matter for the

court's sound discretion."  *Angora Enters., Inc. v. Condo. Ass'n of Lakeside Vill., Inc.*, 796

F.2d 384, 387-88 (11th Cir. 1986) (per curiam); *see also Brillhart v. Excess Ins. Co.*, 316 U.S.

491, 494 (1942) ("Although the District Court had jurisdiction of the suit under the Federal

Declaratory Judgments Act, [ ], it was under no compulsion to exercise that jurisdiction.").  Here,

I find it wholly inappropriate to entertain a challenge to provisions of Florida law which, at best,

27

are only tangentially related to the issues in this suit. "[T]he Supreme Court has established a

long-standing policy of refusing to decide constitutional issues unless strictly necessary."

*Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 777 F.2d 598, 604 (11th Cir.

1985) (citing *Rescue Army v. Mun. Court*, 331 U.S. 549, 568-72 (1947)).  Given this policy and,

by my consideration, the lack of necessity in reaching this claim, I decline to exercise my

discretion under the Declaratory Judgment Act.

IV.

Accordingly, Defendant's Motion for Summary Judgment (Doc. 65) is **granted**.  The

Clerk of Court shall enter judgment in favor of the Defendant which judgment shall direct that

each side bear their own fees and costs.  The Clerk shall then close the case.

**Done and Ordered** in Tampa, Florida, this 15th day of December 2010.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record